Filed 2/28/22  P. v. McCullough CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>JAMES ROBERT McCULLOUGH,<br>        Defendant and Appellant. | A157271<br><br>(Contra Costa County Super. Ct. No. 51820091) |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>JARMON TREYVION DAVIS,<br>        Defendant and Appellant. | A158089<br><br>(Contra Costa County Super. Ct. No. 51820091)<br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 31, 2022, be modified as follows:

1

1. On pages 8–9: Delete the two paragraphs beginning with "To begin with" on page 8 and ending with "let alone, the *Watson* standard" on page 9, and replace with the following sentence:

"Even assuming Detective Mahan's challenged testimony was problematic, we agree with the Attorney General that any error in admitting the testimony was harmless under either the *Chapman*[1] or *Watson*[2] standard." There is no change to the footnotes in the opinion.

2. On page 13, the first sentence of the first full paragraph: Delete the word "Again" at the beginning of the first sentence. The sentence should now read as follows: "Having failed to object to the instruction and request that it be modified, defendants have forfeited any challenge to the instruction on appeal."

There is no change in the judgment.
The petition for rehearing is denied.

Dated: _____

Humes, P. J.

---

[1] *Chapman v. California* (1967) 386 U.S. 18.
[2] *People v. Watson* (1956) 46 Cal.2d 818.

Filed 1/31/22  P. v. McCullough CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>JAMES ROBERT McCULLOUGH,<br>        Defendant and Appellant. | A157271<br><br>(Contra Costa County<br>        Super. Ct. No. 51820091) |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>JARMON TREYVION DAVIS,<br>        Defendant and Appellant. | A158089<br><br>(Contra Costa County<br>        Super. Ct. No. 51820091) |

Defendants James Robert McCullough and Jarmon Treyvion Davis appeal from a judgment of conviction, following a jury trial, of one count of robbery.  (Pen. Code, § 211.)[3]  The jury also found true a personal use firearm enhancement as to Davis.

On appeal, defendants jointly contend the trial court erred in admitting testimony regarding their cell phone numbers and in instructing the jury it

---

[3] All further statutory references are to the Penal Code unless otherwise indicated.

1

could consider "certainty" in determining whether a witness's identification was accurate. Separately, Davis additionally contends his Sixth Amendment rights were violated when his attorney, during closing argument, assertedly conceded guilt as to robbery and his Fifth Amendment rights were violated by a stipulation admitting a prior juvenile adjudication. Separately, McCullough contends the court improperly imposed a parole revocation restitution fine.

The Attorney General concedes imposition of the parole restitution fine was improper, and we agree. In all other respects, we affirm.

## BACKGROUND[4]

The crime at issue occurred as the victim was walking home along a trail from the North Concord Bart station, around 9:30 p.m. on September 6, 2018. The trail, which runs parallel to the highway, has three access points: at the Bart station; at Olivera Road; and at Hamilton Street. The victim was somewhere near the Hamilton Street access point and was walking south toward Olivera Road when a man ran in front him and told him to stop. Until that point, the victim had not seen anyone on the trail. The man then signaled to two other men who approached the victim from behind. One of these men had a gun and touched it to the victim just above his hip but below his chest. The other man walked in front of the victim and began taking the victim's belongings, including his gold iPhone, wallet and backpack which contained his laptop.

All three men were wearing face masks, but the victim was otherwise able to give general descriptions of the men. The gunman was "skinny" and

---

[4] We summarize here only the general background facts. We discuss additional facts pertaining to the issues raised on appeal in the next section as needed.

2

Black.  The man who initially stopped him was tall and had a "larger build," "broad shoulders kind of thing," and White.  The third man was "Five six seven.  Five seven maybe," "skinny," and he was "Lighter than that, the other male, white male so."  After the White "larger build" man took the victim's belongings, the gunman told the victim to walk back toward the Bart station. After a short distance, the victim turned around and continued in the direction of the three men.  He then ran toward a vehicle, which happened to be an unmarked police car, and a police officer stopped to help him.  They both saw the three men running away.

The officer, Concord Police Corporal Anthony Perry, had entered the trail from the opposite end as the victim, via the Olivera Road access point. He was travelling north toward the Bart station and did not encounter anyone until he saw three men, who appeared to be together, walking toward him.  He took note of the men because one of them, later identified as Davis, made a motion with his hands.  The men appeared to be between the ages of 18 and 22.  He noted one was Hispanic and had a "medium build about 6-foot-1, had a very short hair cut" and the other was Black with a "thin build" and wearing a tan jacket or hoodie.  He did not note the race of the third man but described him as "Medium build."  Perry later identified the Black male as Davis.  Perry "exchanged a greeting" with the men and they passed by him.

Around 15 seconds later, the victim ran toward Perry pointing in the direction of Davis and his two companions.  The victim, who appeared "distressed," "almost shouting" told Perry, " 'They just robbed me, they took my backpack and my cell phone.' "  When Perry turned to look, he saw the three running, at a "full sprint" southbound in the direction of a gas station. Perry broadcast a description over police dispatch of a Black male, "six-foot, thin build, a Hispanic male, and a third subject medium build."  He also

3

noted one suspect was "wearing a tan hoodie the other one was wearing a red hoodie." He further stated all three were in their "18's to early 20's with short hair styles" and ordered a perimeter set up. After speaking with the victim, he also dispatched that one of the men was a White "male with a muscular build."

Just west of the gas station, a witness was sitting in a parking lot when he saw two men, one Black and one White between the ages of "19 to about 24 or so" running through the gas station toward his car. As the men were running, they "kept looking back." The witness described the Black male as "about five feet" with short hair, and the White male as "a little bit taller." The White male had a mask on, but it "didn't cover the whole of his face," and he "was trying to take it off." The White male asked to use the witness's phone but the men kept walking. The witness also saw the White male throw his mask on the ground, and when the two left the area, the witness picked up the mask from the road. The witness then saw and flagged down an officer and relayed what he had just seen.

About 40 minutes after Corporal Perry sent out the broadcast, Concord Police Officer Eugene Davis was assisting in setting up a perimeter when the witness near the gas station flagged him down. The witness took Officer Davis back to where he had been parked when he saw the two men. The witness told Officer Davis "he saw the [B]lack male and a [W]hite male disrobing their outer garments," and that the White male had "discarded the ski mask on the sidewalk next to his truck." The witness then gave Officer Davis the mask. Officer Davis also found a discarded dark-colored wallet, which he left in its location so the responding K9 officer could "conduct a . . . trail."

4

While speaking to the witness, Officer Davis was notified that two men, later identified as Davis and McCullough, had been detained. The witness agreed to do an in-field show up, and Officer Davis took him to where the men were detained. After admonishing the witness, the witness identified defendant Davis, saying " 'That's him,' " "[w]ithout hesitation." The witness was uncertain if the White male was the same man he had seen earlier, although he stated he had the "same build." The witness later identified defendant Davis in court.

In the meantime, Deputy Jeff Kellogg and K9 Officer Ronnie had initiated a "trail" after sniffing the victim's laptop and a pistol which had been recovered along the Bart trail. The canine led Kellogg to the gas station. While at the gas station, Kellogg was notified of a new location where a wallet had been found. Kellogg and Ronnie "reinitiate[d]" the trail from the wallet and went in the direction of the Highway 242 overpass. "When Ronnie was trailing along . . . toward the 242 overpass," he located a tan jacket. The victim's gold iPhone was in a pocket.

A second witness had also called police after two men ran in front of her car on the Highway 242 overpass,[5] causing her to slam on her breaks. One male was White with "really short" hair. He was "shirtless, shoeless" and "had some tattoos." She estimated he was "approximately 35 years old," with a "bulkier than average, but more like muscl[ar]" build. She only saw the hands of the second person, but identified that person as Black, with dark skin, wearing "a hoodie and like baggy jeans," and "skinnier than the White

---

[5] The Highway 242 overpass is "at most" approximately "a third of a mile to a half a mile" from the North Concord Bart trail, where the robbery took place.

5

male."  The information provided by the witness was dispatched to officers in the field.

While responding to the location in the dispatch, Officer Ameet Patel also received a radio report from air support about "two males" standing "approximately 100 feet, 150 feet to the east" of the overpass.  Officer Patel responded to that location, where he came upon defendants.  It had been about 40 to 45 minutes since Corporal Perry first made the broadcast about the robbery.  Both defendants were "sweating quite profusely."  And despite the temperature being at the "highest . . . probably low 60s," and the time being approximately 10 p.m., the man later identified as McCullough did not have on a shirt.

The District Attorney filed an information alleging one count of felony second degree robbery (§ 211) as to both defendants.  The information also alleged two enhancements:  as to Davis, that he personally used a firearm in commission of the robbery (§ 12022.53, subd. (b)), and as to McCullough, that he was armed with a firearm (§ 12022, subd. (a)(1)) during commission of the robbery.

The jury found defendants guilty of robbery and found true the enhancements.  As to McCullough, the court struck the section 12022, subdivision (a)(1) enhancement (for sentencing purposes) and sentenced him to three years in state prison.  As to Davis, the court sentenced him to 12 years in state prison, comprised of the low term of two years for the robbery count plus 10 years for the firearm enhancement.

DISCUSSION

**Combined Claims**

*Cell Phone Evidence*

At trial, Officer Patel testified that after defendants were arrested, he seized cell phones from both and provided them to Corporal Perry who booked them into evidence.

Detective Greg Mahan testified he was "requested to perform a follow-up investigation" on the two phones. He first obtained a warrant, and then gave the phones to Detective Scott Smith who performed a "forensic extraction" by downloading the cell phone data for September 4-6, 2018, which included the two days before and the day of the robbery. Detective Smith provided the data to Detective Mahan along with the phone numbers associated with both phones.

When the prosecutor asked Detective Mahan if those phone numbers "correspond[ed] with [the] numbers listed for Jarmon Davis and James Robert McCullough in their booking information," defense counsel objected on the ground of hearsay.

The court replied, "Ladies and gentlemen, I will allow the testimony not for the truth of what was told, but what this witness did next as a result of that information that he got." Defendants made no objection to the court's nonhearsay, limited-purpose ruling.

Detective Mahan then answered, "Yes," and went on to testify that the data confirmed numerous exchanges between the two phones during the requested date range. On the two days leading up to the robbery, there were several calls and texts between the two phones. On the day of the robbery, there were six calls between the phones, over a span of an "[e]ight-or nine-hour period," and four text messages. Detective Mahan did not testify as to

the content of those text messages. On the day of the robbery, the last phone call between the two phones occurred at around 1 pm., and the last text messages occurred around 4 p.m.

On appeal, defendants contend the trial court erred in allowing Detective Mahan's statement regarding the numbers in the booking information for any purpose.

"An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute." (*People v. Turner* (1994) 8 Cal.4th 137, 189.) However, "[a] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is *relevant* to an issue in dispute." (*People v. Armendariz* (1984) 37 Cal.3d 573, 585, italics added, superseded by statute on other grounds as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 255; see *People v. Scalzi* (1981) 126 Cal.App.3d 901, 906-907 [evidence of officer's state of mind irrelevant and thus inadmissible when it does not tend to prove or disprove an issue in the case].)

Here, the trial court ruled Detective Mahan's testimony was admissible not for the truth of the matter, but for the nonhearsay purpose of explaining what the detective did next in his investigation. Defendants maintain why Detective Mahan did what he did next was irrelevant to any issue in the case and therefore the testimony should have been disallowed entirely.

To begin with, defendants have forfeited the issue—they could have, and should have, objected on relevancy grounds to the trial court's limited admission of the evidence. They did not. Instead, having succeeded on their hearsay objection and obtained a ruling excluding the testimony for its truth,

8

they voiced no objection to its admission for a limited, nonhearsay purpose and remained silent as Detective Mahan testified in accordance with the court's ruling. Having failed to make any relevancy objection, defendants forfeited their challenge to the admission of this testimony for a limited purpose. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1184 [failure to object to evidence as irrelevant and unduly prejudicial precluded defendant from raising issue on appeal]; see also *People v. Kipp* (2001) 26 Cal.4th 1100, 1124 [objection to evidence on one ground does not preserve challenge on a different ground on appeal]; Evid. Code, § 353.)

But even assuming defendants preserved the issue, and even assuming Detective Mahan's challenged testimony was problematic, we agree with the Attorney General that defendants cannot demonstrate that prejudicial error in allowing the testimony for a limited purpose under even the *Chapman*[6] standard, let alone, the *Watson*[7] standard.

Defendants insist the testimony regarding the phone numbers was "a highly significant piece of evidence in the prosecution's case," pointing to the prosecutor's closing argument. (Capitalization omitted.)

During closing, the prosecutor told the jury, "You can also consider the other links between defendant McCullough and defendant Davis. You heard about their cell phones. You heard that before the robbery they were regularly calling and texting with one another. There were a number of short calls the day of the robbery, a number of text messages, and on the day before they were regularly calling and texting each other. [¶] After the robbery, we know they were together, and there were no calls, no text messages, they don't call each other. And that's common sense. People don't call and text

---

[6] *Chapman v. California* (1967) 386 U.S. 18.

[7] *People v. Watson* (1956) 46 Cal.2d 818.

9

each other when they're together. [¶] During the time of the robbery, there were no calls and text messages, so they go from communicating regularly via call and text. And we know that when they're together they don't communicate via call and text. You can reasonably infer then from the lack of calls and text messages during the robbery that they were together."

In his final closing, the prosecutor stated, defendant Davis' counsel, "practically conceded the robbery on Mr. Davis. He didn't talk about it at all. . . . [¶] And that's a problem for James McCullough, right. Because if Jarmon Davis did the robbery, and Jarmon Davis and James McCullough were texting before the robbery and then they were together after the robbery a mile up the road less than an hour after the robbery and they weren't corresponding with each other, doesn't really matter who else they were corresponding with, they weren't corresponding with one another—that is why I brought the correspondence between the two phones—you can infer they were together."

Notably, the prosecutor made no mention of Detective Mahon's challenged testimony. Moreover, that these two phones were seized from defendants and the data retrieved from the phones showed phone and text exchanges correlating with the events before, during, and after the robbery, alone, is strong evidence the phones belonged to defendants.

There was also abundant other evidence defendants committed the robbery. Witnesses described defendants and their clothing. Defendants were arrested together, near the scene of the robbery, approximately 45 minutes after it occurred. The victim followed the three men, toward Corporal Perry. Both the victim and Corporal Perry saw the suspects flee toward the gas station. This was confirmed by the K9 officer who tracked defendants' path from the trail to the gas station, and from the gas station to

near where the defendants were arrested together.  The K9 officer also found clothing matching the reports of the perpetrators' clothing, including a jacket, near the location of their arrest.  Plus, the victim's cell phone was found inside the jacket pocket.

Given the abundance of other evidence that defendants committed the robbery, any error in admitting Detective Mahon's testimony not for the truth of the matter, but for the limited purpose to show whats he did next as a result of that information, was harmless under *Chapman*, as well as *Watson*.[8]

### *CALCRIM No. 315*

The second witness—who called police after two men ran in front of her car on the Highway 242 overpass—testified that one male was White with "really short" hair, and he was "shirtless, shoeless" and "had some tattoos." She estimated he was "approximately 35 years old," with a "bulkier than average, but more like muscl[ar]" build.  She only saw the hands of the second person, but identified that person as Black, with dark skin, wearing "a hoodie and like baggy jeans," and "skinnier than the [W]hite male."  At trial, this witness testified she was "certain" that defendant McCullough was the White male who ran in front of her car.

After close of evidence, the court instructed the jury.  Both McCullough and the district attorney requested CALCRIM No. 315.  Without objection or request for modification, the trial court instructed the jury as follows:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  [¶] In evaluating identification testimony, consider the

---

8  We therefore need not, and do not, address defendant's assertion that the challenged testimony was "testimonial" in character under *Crawford v. Washington* (2004) 541 U.S. 36, and therefore prejudice must be evaluated under the *Chapman* standard.

11

following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] *How certain was the witness when he or she made an identification*? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (CALCRIM No. 315, italics added.)

Defendants now claim the trial court prejudicially erred in instructing the jury with CALCRIM No. 315. Specifically, they maintain the court erred in instructing the jury it could consider an eyewitness's level of "certainty" in evaluating identification testimony because "scientific studies" demonstrate there is no relationship between the certainty of an eyewitness identification and the accuracy of the witness's testimony.

12

Again, having failed to object to the instruction and request that it be modified, defendants have forfeited any challenge to the instruction on appeal. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*) [trial court had no sua sponte duty to modify CALJIC No. 2.92 on identification to exclude the certainty factor, and defendant therefore forfeited issue].)

In an attempt to avoid forfeiture, defendants assert they did not want the instruction "modified," but rather, wanted the instruction to "not be used at all." The record is to the contrary. McCullough requested CALCRIM No. 315, and Davis voiced no objection to it.

They further claim any objection would have been futile. While failure to object may be excused when the governing law at the time affords no legitimate ground for objection (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215), there was, in fact, case law that could have supported the objection they are now attempting to pursue on appeal. (See *Sánchez, supra*, 63 Cal.4th at pp. 495–498 (conc. opn. of Liu, J.) and the cases cited therein.) Indeed, as of the time of trial, *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which dealt with the witness "certainty" factor, had been pending before the Supreme Court for six months. Accordingly, there is no doubt defendants could have raised the issue in the trial court. They did not and forfeited the issue. (See *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 ["Rodriguez argues CALCRIM No. 315 violates his Fourteenth Amendment due process rights because it tells the jury to consider eyewitness certainty. Rodriguez's counsel did not object at trial. This is forfeiture."].)

In any case, even if defendants had not forfeited the issue, any error in the instruction was harmless. In *Sánchez,* for example, the Supreme Court ruled that in addition to defendant having forfeited the witness certainty issue, any error in CALJIC No. 2.92 on identification was harmless because

the instruction "cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy." (*Sánchez, supra*, 63 Cal.4th at p. 462.)

Five years later, the high court decided *Lemcke, supra*, 11 Cal.5th 644. In that case, the defendant was convicted of assault and robbery. The prosecution's case turned on "testimony of the victim, who identified [the defendant] as her assailant and confirmed that she had previously identified [him] during a photographic lineup." (*Id.* at p. 646.) After the prosecution requested CALCRIM No. 315, defense counsel, citing to the concurring opinion in *Sanchez,* objected to the instruction and requested the court modify it by striking the eyewitness certainty factor. (*Id.* at p. 652.) The trial court declined to do so, "explaining that the certainty language set forth in CALCRIM No. 315 was consistent with the defense expert's testimony that confidence can be reliable under certain circumstances. The court acknowledged the expert had cast doubt on the usefulness of certainty more generally but concluded that the defense could raise those points at closing argument." (*Ibid.*)

On appeal, the defendant argued the "certainty instruction violated his federal and state due process rights to fair trial [citations] because empirical research has shown that a witness's confidence in an identification is generally not a reliable indicator of accuracy." (*Lemcke, supra*, 11 Cal.5th at pp. 646, 654.) Specifically, he asserted the instruction lowered the prosecution's burden of proof by "causing jurors to 'equat[e] certainty with accuracy, when science establishes otherwise,'" and the instruction denied him a " ' "meaningful opportunity to present a complete defense" ' as to 'why the identification was flawed.' " (*Id.* at p. 657.)

14

The Supreme Court rejected the defendant's due process claims stating, "When considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [his] trial fundamentally unfair." (*Lemcke, supra*, 11 Cal.5th at p. 647.) Moreover, nothing in the instruction on witness certainty "operates to 'lower the prosecution's burden of proof,'" and "the instruction does not direct the jury that 'certainty equals accuracy.'" (*Id.* at p. 657.) Instead, the instruction "merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed. . . ." (*Ibid.*)

Additionally, the defendant in *Lemcke* was "permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated," and nothing in CALCRIM No. 315, said the court, suggested the jury should ignore that testimony. Indeed, the trial court "provided additional instructions" directing the jury that it was required to consider the expert testimony. (*Lemcke, supra*, 11 Cal.5th at p. 647.) Plus, the trial court had instructed that the defendant was presumed innocent and the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt, which further "undercut [the defendant's] contention that the certainty language lowered the prosecution's burden of proof." (*Id.* at p. 658.)

Next, the high court ruled there was "no merit" to the defendant's claim that he was denied a meaningful opportunity to present a complete defense.

15

Indeed, stated the court, the record showed the opposite—that the defendant "put on a vigorous defense on the issue of identity." (*Lemcke, supra*, 11 Cal.5th at p. 660.) He called an eyewitness identification expert, and he had the opportunity to cross-examine the witness regarding her identification and the investigating officers regarding the procedures used in photographic lineups. (*Ibid.*)

Nevertheless, although the instruction did not violate the defendant's due process rights, our Supreme Court joined with other jurisdictions "in acknowledging that this form of instruction has the potential to mislead jurors." (*Lemcke, supra*, 11 Cal.5th at p. 665.) In an exercise of its supervisory powers, the court directed "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Id.* at p. 669.) In a footnote the court stated, "We have previously distinguished the effect of the certainty instruction in cases where a witness has expressed doubt, rather than confidence, about the accuracy of the identification. (See *Sánchez, supra*, 63 Cal.4th at p. 462 [' "[certainty] instruction has merit in so far as it deals with the testimony of a witness who expressed doubt about the accuracy of her identification. . . ." '].) The misleading effect we are concerned with here—that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is not present when a witness has expressed doubt regarding the identification." (*Lemcke,* at p. 669, fn. 19.)

Although the Supreme Court has instructed trial courts to omit the certainty factor unless the defendant requests it, any error in including that factor in this case was not prejudicial given the overwhelming evidence

against defendants, which we have recounted above. Additionally, various witnesses testified regarding the identity of defendants, with various levels of certainty. For example, although the second witness testified she was "certain" McCullough was the man who ran in front of her car near the overpass, the first witness near the gas station testified he was not certain the White male was McCullough although he had the "same build." Finally, the certainty factor was one of 15 factors, neutrally given to the jury, and the court further instructed the jury that the People were required to prove defendants' guilt beyond a reasonable double.

Accordingly, on this record, any error in including the certainty factor in the instruction on eyewitness identification was not prejudicial under either *Chapman* or *Watson.*

## Davis's Claims

### *Defense Counsel's Closing Argument*

In his closing argument, Davis's counsel focused almost exclusively on the firearm enhancement.

Counsel stated:

"Okay. In this country there are—well, in this country we first say that there's no higher office than that of citizen. And as citizens, there are two points where we stand in judgment of our government. First, when we go to the polls and we vote for our elected leaders. And the second is what 14 people in this box are doing right now.

"And very soon you're going to go back in that deliberation room and begin to discuss this case. And don't forget that as you do that, there's a man, Mr. Davis, seated right now in that chair who is charged with an enhancement that he did not commit.

"So let's walk through how we both know that the government, the prosecutor here, didn't prove that personal use enhancement for the firearm as to Mr. Davis and didn't actually come close whatsoever.

"Let's first start with [the victim]. And obviously when it comes to [the victim], there's one thing in this case I think everyone in this room agrees on is that [he] was a true victim. Seems like a perfectly nice guy. And he was put, through no fault of his own, into a situation that was really scary, really unexpected, and happened incredibly quick.

"He was also put into this situation, through no fault of his own, with three other individuals who were—who made the choice to cover themselves up and did so in an environment with extremely poor lighting, very difficult to see.

"And we also know that [the victim] has changed his story as to what occurred and how he knows what he relayed to all of you when he was on that witness stand. And we know it both from what he said on the witness stand and from the two pieces of the phone call that he had with . . . [an Inspector]. . . . [¶[] . . .[¶]

". . . [I]f you recall when [the victim] was on the witness stand testifying about the person with the gun, he testified that he made the identification of that person as a [B]lack male through the skin of that individual's neck. And I asked him, how certain are you of that that you saw the person's neck and that that's how you're able to say the person with [the] gun as a [B]lack person. And he said 90 percent. And now we know on February [*sic*] 6th, that's not what he said. We know that his memory of this event has changed.

"Now, the prosecutor wants to put forth his memory as though it were a movie, something you could just push play and it's going to be the same thing every time you watch it. But that's not the case. Memory is a tough thing. And we know because of this dynamic situation, because of probably what he heard from Officer Perry when he was in the field, and because of the nature of memory itself, that [the victim's] memory has changed.

"There's certain things that no one is questioning. There's no question that he was robbed with a gun, there's no question that there were three individuals that robbed him with this gun, but his ability to determine who each person was, who the respective players are is absolutely questionable because you've heard it yourselves.

18

"His story has changed. And it's his story and his story alone by which the prosecutor is trying to link the personal use enhancement to Mr. Davis, trying to say that Mr. Davis is the person that held that gun.

"Also keep in mind that while this occurred, we heard from [the victim] that the person with the gun was actually behind him, that it would have been incredibly difficult for [the victim] to see any portion of that person regardless of whether they had a mask on based on where he was positioned and especially in light of the fact there were unknown individuals to his front.

"We also know that Officer Perry influenced [the victim's] statement, his testimony, his memory. And that's through no fault of [the victim].

"[The victim] was put in an incredibly vulnerable position, terrifying position, and immediately after that position—that situation occurred, that crime occurred, he was put in contact with Officer Perry, someone he was understandably looking to for protection, an authority figure.

"And while his mind is racing, while he is still living through the terror of that event, Officer Perry is relaying information both to him and through dispatch. And his brain is taking that information and trying to incorporate it into what he just experienced, trying to make that information a part of his narrative, something that he told you on the witness stand, testified to on the witness stand as though it happened to him, as though it were his memories. [¶] . . . [¶]

"So Corporal Perry on that witness stand, he described Mr. Davis making an unusual motion, kind of this shimmying motion that I'm not going to try to imitate while Mr. Davis was walking down the path with these two other individuals.

"Now, let's assume this robbery occurred. Why on Earth would Mr. Davis be making that motion to a police officer moments after committing this robbery?

"Well, one reasonable explanation is that it would provide an opportunity for the other two people to ditch the gun and the laptop on the trail, just throw it in the moment when Officer Perry was looking at Mr. Davis and not them.

"So what can you infer from that?  You can infer that Mr. Davis is not the person who held the firearm, because he's essentially acting as the distraction so that the person who actually did have the gun during the course of this robbery can get rid of it.

"I want to say something else about Officer Perry.  Officer Perry, who we heard a lot about when it comes to his training and experience with firearms, he's someone who's been clearly interested in guns, raised with guns.  When he first saw the gun, he thought it was a replica, a fake.

"Of course, I'm not going to get up here and argue the gun, in fact, was a fake, but I do think that's something you can consider when it comes to Officer Perry's ability to see what's going on on this path at night.

"He's an expert with guns, and yet when he first sees it thinks it's a fake gun.  And he's a trained observer, we heard that from the prosecutor, that he's a police officer who in that moment is in investigative mode.  And when he sees this gun on the side of the trail, he thinks it's fake, and it's only sometime later when he realizes that it's, in fact, a real gun.

"So if the trained observer is making mistakes on this path at this time of night and the trained observer has not been victimized, isn't it also reasonable that [the victim] can make some mistakes as well. . . .

"And we also know there's a third suspect on the trail, someone right in front of Officer Perry that he can't identify, okay.  He saw the person, and now his memory has failed him.  And that happens to all of us, and it doesn't mean you did anything wrong.  But that's the lens and the reality by which this jury has to look at the evidence in this case and make the determination as to whether the government has proven that enhancement.

"The prosecutor brought up the K-9 dog, so I'll make a few brief comments about that.

"The dog—we don't know who the dog tracks of if the dog is tracking anyone from the trail of the robbery to the Shell gas station.  We do know that once the dog is provided with the wallet, that he tracks to

20

the jacket that the prosecutor has said belonged to my client Mr. Davis, and in that jacket there is the gold cell phone.

"Now, [the victim] made it clear that whoever had the gun wasn't the person taking the items; that the person who had the gun was standing behind him holding the gun up while the other two went through his pockets.

"So if Mr. Davis was the person with the gun who was not taking the items, how did he end up with the cell phone? How did the wallet that was taken from [the victim] provide the dog with a track to my client's jacket?

"The only explanation would be that it's my client who is taking the items and not the one holding the gun.

"Okay. There's also DNA. This gun was preserved for firearm testing, and there's been no explanation as to what happened with that.

"Now, because the government has such a high burden, this is it for me, you're not going to hear from me again, the prosecutor gets their chance at rebuttal. And there's a few things I want to say about rebuttal generally.

"I don't anticipate this is going to happen here, but I've had the experience where new arguments I've never heard before are raised on rebuttal. And obviously that's called sandbagging. That's not right because I can't respond. I'm very confident that will not happen here, but as an advocate I got to cover all my bases.

"So if it does, I'm going to rely on this jury to simply ask yourselves, what is the reasonable response to that. If [defense counsel] had the opportunity to respond to that argument he's never heard before, what would that response be.

"And I'm sure that the prosecutor is going to address the DNA in his rebuttal, because he has to, why we haven't heard a thing about that. No matter what he says, I want you to keep in mind this reality.

"The burden of proof lies on one side. That is the government. And in this case you have giant void when it comes to the DNA on that gun,

the DNA that can link—the potential to link the gun to whoever was holding it that night, and this jury has nothing.

"I'm also going to make a few comments about this prior incident, this prior robbery that my client committed.

"Now, outside the presence of the jury, Judge Brady took judicial notice. My client's birthday is [redacted].

"So, when that prior incident occurred, my client was 13 years old and two months. And the prosecutor made clear, something we do agree on, that it can only be used—that prior incident can only be used for two things: One is intent. But really I would argue that shouldn't be considered here, because somebody pulls a gun on someone and takes their stuff, they're intending to rob them, okay. There's no question.

"Two is this MO, that the nature of that prior robbery was so distinct and unique that that's, in and of itself, something that can be used to show that my client was the robber here.

"But again, that doesn't have any actual application. My client was 13 years old. You know, the idea that because he made a mistake when he was 13, that the similarities involved there have any application here, it's a stretch. This jury should not consider it for any purpose when it comes to any issue, and especially the issue of whether the use enhancement has been proven.

"Now I'm going to wrap up with some of these legal concepts that we've already hit, so I'm going to move quick because I know you've already heard about them.

"But this is a different graphic I don't think [McCullough's counsel] showed you when it comes to circumstantial evidence. Specifically I want to talk about the application of circumstantial evidence to the personal use enhancement.

"So if this jury looks at all the evidence, the evolution of [the victim's] testimony, the lack of forensic evidence, the lighting on the trail, and thinks that it is both reasonable that Mr. Davis could have had the gun in his hand, and also reasonable that Mr. Davis did not have the gun, it was one of the two other people, in that situation on the personal use

enhancement the law requires a not guilty or, in this case, a not true finding for that enhancement. And it is only when the idea that it was not Mr. Davis with that gun is an unreasonable idea, that the law compels a guilty or true finding as to the personal use enhancement.

"This is the same idea as the language that's going to come directly out of the instruction. If one of the conclusions you can draw from circumstantial evidence, whether it comes to a particular piece of circumstantial evidence or a case that's based entirely on circumstantial evidence like this one, and one of those conclusions points to innocence and that's reasonable, boom, not guilty.

"Okay. So that's the whole instruction you're going to get, but I want you to focus on just this one little part right now.

"Let's talk about this. Proof beyond a reasonable doubt leaves you with an abiding conviction. Those two words are critical. Abiding is long lasting. Conviction is a deeply held belief.

"So in other words, when it comes to that enhancement, does it leave you with a deeply held long-lasting belief that the prosecutor has proven it was Mr. Davis with that gun. . . . [¶] . . . [¶]

"This abiding conviction has to be something, a belief that stays with you for days, weeks, months, and years. And in light of what the testimony and evidence you have here, that's simply not possible when it comes to the issue of the personal use enhancement. [¶] . . . [¶]

". . . [P]roof beyond a reasonable doubt. That's the standard that applies to the charge and both the enhancements. That applies to both of these individuals.

"Here's that gray area that [McCullough's counsel] talked about. Now, ultimately all of this kind of points to one question when it comes to Mr. Davis and the argument I've addressed here. Can you rule out reasonable doubt? That's his job. He has to eliminate reasonable doubt.

"In this case, is it reasonable that someone else was holding that gun. Based on all the changes you've heard in the testimony of [the victim], and all the problems with the lighting and the lack of forensic evidence,

23

is it just reasonable that it wasn't Mr. Davis? If it is, that finding and the enhancement is not true.

"Now, when it comes to this enhancement of the firearm, it talks about how your job as citizens standing judgment of your government. You know, you're near the end, but you're at the most critical part as well.

"Mr. Davis is charged with this crime and this enhancement that he did not commit. He's on the precipice of a profound injustice, and there's no 12 people on this Earth that can save him from the fall but the 12 of you. [¶] . . . [¶] The personal enhancement has not been proven. I thank you for your service."

During rebuttal, the prosecutor stated, "You also notice that [Davis's counsel] practically conceded the robbery on Mr. Davis. He didn't talk about it at all. He's given up."

After the jury exited to deliberate, McCullough's counsel asked the court "to put something on the record." She stated, "So there was something with regard to [the prosecutor's] rebuttal and closing argument that I did want to note, which is that [the prosecutor] made the assertion that Mr. Davis . . . had conceded the robbery. [¶] . . . [¶] And so I'm concerned that [the prosecutor] argued in front of the jury that that concession was made, even though I think that under the law the requirements are clearly very different in order to concede a charged offense. So I did just want to note that issue for the record."

The court responded, "I think we may have a different situation here," but asked for Davis's counsel response. Counsel replied, "I don't think I have anything to say." The court then allowed McCullough's counsel to research the issue and bring up any concerns.

The next day, the court stated, "So what I received is a request from defense counsel for Mr. McCullough to file and cite two cases in support of

the issue that we talked about yesterday, the objection that was made with regard to closing arguments." The People took the position that McCullough's counsel was asserting prosecutorial misconduct, and that the issue was therefore waived because she failed to object to his statement at the time he made them in his rebuttal. Or, alternatively, that defense counsel lacked standing to object on behalf of Davis.

McCullough's counsel explained she was actually asserting structural error. She stated, "I understand that [Davis's counsel] did not say explicitly 'I am conceding the robbery on behalf of my client.' But I think a fair reading of the record is that that is what was said and, in fact, [the prosecutor] then got up and argued [Davis's counsel] has conceded the charge of robbery, has said that that charge is true for his client. And there was no objection from [Davis's counsel] as to that point. . . . [¶] My concern is that on this record there has been an implicit concession as to that charge, especially given [the prosecutor's] arguments and the lack of response, and I think that that creates a potential for structural error that affects my client. Because, as the Court heard in closing argument, [the prosecutor] argued that because there was this concession from [Davis's counsel], that that now has an effect on how the jury should see my client and whether or not he should be found guilty of these charges. [¶] So the point that I want to make very clear for this record is that I do believe my client has been prejudiced by what I believe may be an error that occurred during this trial, and I just want to note that for the record."

The court decided to address the merits, regardless of any issues of waiver or standing. After once again hearing from McCullough's counsel and the prosecution—Davis's counsel again declined to make any comments—the court stated, "I think there's a substantial question mark whether or not in

25

this particular factual scenario, whether or not Mr. McCullough can complain about the strategic argument decisions that were made by Mr. Davis' counsel. [¶] I've read the cases, and the one thing that distinguishes all of them, frankly, from what occurred in this case is there was absolutely no concession during Mr. Davis' counsel's argument. [¶] You can imply lots of things, but counsel make strategic decisions about strengths and weaknesses of their case, and argues appropriately. And it was clear from the closing argument to me that [Davis's counsel] was focusing on the firearm issue and not mentioning or focusing on the robbery itself. [¶] I don't think that's necessarily and I don't think legally you can assume that that is a concession." Continuing the court stated, "I think competent defense counsel makes choices about how they argue their case to focus the jury on what they think is most advantageous to their client, and in this case it appears as though [Davis's counsel] focused on the firearm because this is the enhancement that carries the biggest impact for his client. . . ." Finally, the court noted that what the prosecutor argued in rebuttal was not evidence— and that indeed, the jury is instructed "regularly, the arguments of counsel are not evidence"—and even so, the prosecutor's comments did not "make it a concession either."

On appeal, Davis, citing *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500] (*McCoy*), contends his "Sixth Amendment right to maintain his innocence . . . cannot be overridden by counsel's tactical decision" of concession. (Capitalization & boldface omitted.)

In *McCoy*, defense counsel had concluded "the evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid." (*McCoy, supra*, 138 S.Ct. at p. 1506.) Counsel relayed his strategy to the

26

defendant, who objected to any admission of guilt and "vociferously insisted" in his innocence. (*Id.* at p. 1505.) Nevertheless, over the defendant's objection, counsel conceded guilt. (*Ibid.*) In his opening statement, counsel told the jury "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion that Robert McCoy was the cause of these individuals' death.'" (*Id.* at p. 1506.) He continued, "the evidence is 'unambiguous,' 'my client committed three murders.'" Despite defendant's testimony maintaining his innocence, counsel also—in his closing argument—"reiterated that McCoy was the killer." (*Id.* at p. 1507.)

The United States Supreme Court granted certiorari to determine "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." (*McCoy, supra*, 138 S.Ct. at p. 1507.) The court held, "When a client expressly asserts the objective of '*his defen[s]e*' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id.* at p. 1509.) The court concluded that defense counsel's failure to abide by that objective was structural error and a new trial was required. (*Id.* at p. 1511.)

*McCoy* differs markedly from the instant case.

To begin with, as the trial court observed, defense counsel did not expressly concede guilt on the substantive offense. Rather, counsel made the tactical choice to focus on the enhancement, which carried a substantially higher sentence than that of the substantive offense. Moreover, Davis's closing argument followed that by McCullough, and McCullough's attorney focused on the substantive offense, as well as on the armed enhancement (which the court later struck for purposes of sentencing).

27

Defendant claims, however, that "the gist" of his attorney's argument was that he "was one of the robbers, but not the one with the gun." He points in particular to that portion of the argument where his attorney stated, "There's certain things that no one is questioning. There's no question that [the victim] was robbed with a gun, there's no question that there were three individuals that robbed him with this gun, but his ability to determine who each person was, who the respective players are is absolutely questionable because you've heard it yourselves."

However, this was not a concession by counsel that either his client, or McCullough, were the perpetrators. In fact, Davis acknowledges his attorney subsequently "argued the robbery as an assumption," but maintains counsel had "already conceded that it did happen." However, the record does not bear that out. Indeed, his attorney ended his closing argument by stating, "Mr. Davis is charged *with this crime* and this enhancement that he did not commit." (Italics added.)

Davis's reliance on the prosecutor's statement on rebuttal—that "You also notice that [Davis's counsel] practically conceded the robbery on Mr. Davis"—is similarly unavailing. The jury was expressly instructed that nothing counsel said in their closing arguments was evidence. "We presume the jurors understood and followed the instructions." (*People v. Johnson* (2015) 61 Cal.4th 734, 770.)

Unlike in *McCoy,* there also were no "vociferous" or "insistent" objections by defendant to his counsel's closing argument. Defendant contends the record "supports the inference that [he] intended to invoke his Sixth Amendment right to maintain innocence" because he pled not guilty and because he "elected trial by jury, thereby invoking his due process right to have every element of the offense proven by the prosecution beyond a

reasonable doubt." But every defendant who goes to trial pleads not guilty and declines to waive a jury—these initial defense actions say nothing about the strategy that is ultimately adopted at trial. (See *McCoy, supra*, 138 S.Ct. at p. 1509 ["If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest."].)

In sum, there is no merit to Davis's claim that his counsel's strategy at trial—to focus on the enhancement—was contrary to Davis's personal objective and therefore a violation of his Sixth Amendment rights.

### *Prior Armed Robbery Conviction*

Pursuant to the parties' stipulation, the following was read to the jury: "Defendant Jarmon Davis was charged with and admitted to committing a felony violation of Penal Code section 211, second-degree robbery . . . , on September the 24th, 2013."

On appeal, defendant contends the "fact of [his] prior adjudication was inadmissible; only the underlying conduct was admissible," and this erroneous admission violated his state and federal due process rights to a fair trial.

Having stipulated to the admission of his prior adjudication, Davis has waived any claim of error. (*People v. Gallego* (1990) 52 Cal.3d 115, 195 [defendant waived claim of prejudicial error by counsel's stipulation to an instruction on "defendant's prior criminal record, including an adjudication for lewd conduct when he was 13, and an adjudication for armed robbery when he was 16"].)

29

**McCullough's Claims**

### *Parole Revocation Fine*

At sentencing, based on "an implied finding of [McCullough's] inability to pay," the trial court declined to impose a restitution fine pursuant to section 1202.4, subdivision (b).[9]  However, over counsel's objection, the court went on to impose and stay an $800 parole revocation fine pursuant to section 1202.45, subdivision (a).[10]

On appeal, McCullough contends, and the Attorney General concedes, the trial court erred in imposing the $800 parole revocation fine.  The concession is well taken.  As the Attorney General acknowledges, the trial court cannot impose a parole revocation fine under section 1202.45, subdivision (a), that exceeds the restitution fine imposed under section 1202.4, subdivision (b), which, in this case, was zero.  We therefore shall remand the case for the trial court to strike the parole revocation fine.[11]

### DISPOSITION

The matter is remanded back to the trial court to strike the parole revocation restitution fine as to McCullough.  In all other respects, the judgements are affirmed.

---

[9]  Section 1202.4, subdivision (b) provides, "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."

[10]  Section 1202.45, subdivision (a) provides, "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4.

[11]  Given that we have rejected all of McCullough's other claims of error, we need not, and do not, address his final claim of cumulative error.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

East, J.

A158089, People v. Davis, A157271, People v. MCCULLOUGH

31